## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Douglas A. Kelley, *in his capacity as the Trustee of the BMO Litigation Trust*, | Case No. 19-cv-1756 (WMW) |
| Plaintiff, | |
| v. | **ORDER** |
| BMO Harris Bank N.A., *as successor to M&I Marshall and Ilsley Bank*, | |
| Defendant. | |

---

| | |
|---|---|
| BMO Harris Bank N.A., *as Successor to M&I Marshall and Ilsley Bank*, | Case No. 19-cv-1869 (WMW) |
| Appellant, | |
| v. | **ORDER** |
| Douglas A Kelley, *in his capacity as the Trustee of BMO Litigation Trust*, | |
| Appellee. | |

---

In these related bankruptcy matters, Appellant-Defendant BMO Harris Bank N.A. (BMO Harris) appeals a July 1, 2019 Order of the United States Bankruptcy Court for the District of Minnesota, which imposed spoliation sanctions against BMO Harris. Plaintiff-Appellee Douglas A. Kelley, in his capacity as the Trustee of the BMO Litigation Trust (hereinafter, Kelley or the Trustee), opposes BMO Harris's appeal. For the reasons addressed below, the bankruptcy court's July 1, 2019 Order is affirmed.

## BACKGROUND

This bankruptcy matter arises from a Ponzi scheme orchestrated by Thomas J. Petters and his associates between 1994 and 2008. Petters was the owner, director, and CEO of Petters Company, Inc. (PCI). During the course of the Ponzi scheme, PCI obtained billions of dollars from investors through fraud, false pretenses, and misrepresentations about PCI's purported business. Billions of dollars were wired into and out of PCI's depository account at National City Bank, which was acquired by M&I Marshall and Ilsley Bank (M&I) in July 2001. BMO Harris is the successor to M&I, and the claims at issue in this bankruptcy matter pertain to M&I's handling of PCI's account.

In the underlying fraud action, the district court appointed Kelley as the equity receiver for PCI in an October 6, 2008 Order. *See United States v. Petters*, No. 08-SC-5348 (ADM/JSM), 2008 WL 4614996, at *3 (D. Minn. Oct. 6, 2008). In that same October 6, 2008 Order, the district court enjoined third-party financial and banking institutions—including BMO Harris, as successor to M&I—from disposing of any material "business, corporate, foundation, banking, financial, and/or accounting records in their possession" that pertain to Petters, PCI and other affiliated entities. *Id.*

Kelley filed for Chapter 11 bankruptcy relief on behalf of PCI and was appointed as the Chapter 11 Trustee. *In re Petters Co.*, 401 B.R. 391, 415 (D. Minn. Bankr. 2009). The bankruptcy court confirmed PCI's Second Amended Plan of Chapter 11 Liquidation, which transferred certain assets, including the causes of action at issue here, to the BMO

Litigation Trust.   The Trustee subsequently commenced this adversary proceeding alleging that BMO Harris was complicit in the Ponzi scheme through its dealings with Petters, PCI, and PCI's account.  The Trustee alleges that BMO Harris failed to respond to irregularities as required by banking regulations that, together with other acts and omissions, legitimized and facilitated the Ponzi scheme.

During fact discovery, which ended in 2018, several disputes arose with respect to BMO Harris's preservation and production of email backup tapes.  In particular, these disputes pertained to the Trustee's attempts to obtain M&I email records from before March 2005, when M&I implemented a new email archive system.  Relevant details of these disputes are summarized below.

M&I undisputedly received a copy of the October 6, 2008 injunction order issued in the underlying fraud action, which prohibited the destruction of records pertaining to Petters, PCI and other affiliated entities.   M&I subsequently issued its first formal litigation hold on January 31, 2010, and issued a second litigation hold on October 20, 2010.  These formal litigation holds were received by, among others, M&I's counsel and senior M&I employee John Vanderheyden.  Meanwhile, in summer 2009, M&I began planning a consolidation and decommissioning project for most of its regional servers, including its Minnesota server.   Vanderheyden's team of M&I employees were responsible for backing up records as well as the server decommissioning project.  As part of the server decommissioning project, M&I created backup tapes from each

regional server.  M&I created the final regional backup tape for the Minnesota server in September 2010.

In 2010, dozens of Minnesota backup tapes were collected for disposal.  (In an interrogatory response dated August 29, 2014, BMO Harris attested that the "Minnesota regional email backup tapes were collected and destroyed in the time period between October 2010 and January 2011."  Vanderheyden subsequently testified at his deposition that, when these backup tapes were destroyed, no one at M&I consulted with counsel to confirm whether anything on the backup tapes should be preserved.  And M&I made no effort to assess the contents of the backup tapes before destroying them.

BMO Harris acquired M&I in 2011.  Subsequently, in connection with fact discovery in another Petters-related lawsuit in Florida, Vanderheyden directed BMO Harris employee David Scherer to search for any existing email backup tapes.  According to an August 2014 email that Vanderheyden sent to BMO Harris's counsel in the Florida litigation, Scherer found six backup tapes from the Minnesota email server (hereinafter, "2014 Tapes") and the earliest of the 2014 Tapes included a label dated August 2007.  BMO Harris did not search the contents of the 2014 Tapes and, thus, has no knowledge as to whether the 2014 Tapes contained emails from before March 2005.  BMO Harris has no knowledge of what happened to the 2014 Tapes after Scherer found them, and Vanderheyden later testified that the 2014 Tapes could have been destroyed.

Discovery in this matter began in early 2017.  In February 2017, BMO Harris's counsel re-commenced the search for Minnesota email backup tapes.  In doing so, BMO

Harris's counsel told BMO Harris's employees, including Vanderheyden and Scherer on multiple occasions, about the importance of either finding Minnesota email backup tapes or confirming that no such backup tapes exist. Neither Vanderheyden nor Scherer told BMO Harris's counsel about the 2014 Tapes.

On December 14, 2017, BMO Harris employee Paul Stroble searched and found five Minnesota email backup tapes (hereinafter, "2017 Tapes"). The 2017 Tapes are the only Minnesota email backup tapes that are currently known to exist. When he found the 2017 Tapes, Stroble also found four backup tapes with Milwaukee region labels and 36 backup tapes that had no labels.

The next day, the Trustee deposed Vanderheyden on the topic of email backup tapes. Nonetheless, BMO Harris did not inform its counsel about the 2017 Tapes until more than one month later, on January 18, 2018. And BMO Harris's counsel did not inform the Trustee about the 2017 Tapes until January 31, 2018, after the close of business on the last day of the fact discovery period. Prior to this date, BMO Harris had repeatedly represented to the Trustee and the bankruptcy court that all of the Minnesota email backup tapes had been destroyed no later than January 2011. Two days later, on February 2, 2018, BMO Harris first informed its own counsel about Vanderheyden's August 2014 email pertaining to the discovery of the 2014 Tapes.

At the Trustee's request, the bankruptcy court held a status conference on February 21, 2018, to address the issue of email backup tapes. At that hearing, the bankruptcy court advised BMO Harris's counsel:

> [Y]our credibility with me is pretty low when it comes to what's being disclosed and what's not being disclosed. I would have thought that being sanctioned a month ago[1] would perhaps have caused you and your client to be a little bit more forthcoming.
>
> Therefore, I'm going to order you to produce everything, all of the backup tapes, to the [Trustee].

At a subsequent hearing on April 5, 2018, the bankruptcy court asked multiple times whether BMO Harris had a witness who could testify about BMO Harris's discovery of the 2014 Tapes. The record reflects that Scherer, the BMO Harris employee who discovered the 2014 Tapes, was present in the courtroom. But BMO Harris's counsel did not disclose to the bankruptcy court that Scherer had discovered the 2014 Tapes or proffer Scherer to testify as to this issue. Although Scherer later provided testimony during that hearing, he testified that "a different team" had handled backup tapes and that he "didn't deal with the tapes" and "didn't touch them," without disclosing that he had found the 2014 Tapes.

At that same hearing, BMO Harris's counsel argued that BMO Harris had not preserved or searched the 2014 Tapes because BMO Harris believed the 2014 Tapes did not contain relevant non-duplicative information. The bankruptcy court rejected these arguments, finding that the 2014 Tapes reasonably could have contained relevant non-duplicative information and that BMO Harris had no justification for failing to review the contents of the 2014 Tapes. The bankruptcy court also found that BMO Harris had

---

[1]    In a January 8, 2018 Order, the bankruptcy sanctioned BMO Harris for willfully violating an unrelated prior discovery order.

falsely certified in multiple discovery responses that there were no backup tapes and that all backup tapes had been destroyed.  In addition, the bankruptcy court found that BMO Harris had provided no justification for its failure to timely disclose the existence of the 2017 Tapes.  The bankruptcy court imposed monetary sanctions on BMO Harris for willful discovery violations based on BMO Harris's delayed production of the 2017 Tapes.  The bankruptcy court expressly declined to impose spoliation sanctions against BMO Harris but observed that the Trustee "may file a motion at a later date for the Court's consideration when the case is trial ready."

Before and during the April 5, 2018 hearing, BMO Harris provided vague and inconsistent representations as to how many backup tapes were found in 2014 and whether any of the 2014 Tapes were the same as the 2017 Tapes.  One week *after* the April 5, 2018 hearing, BMO Harris first informed the Trustee about Vanderheyden's August 2014 email pertaining to the discovery of the 2014 Tapes.  The bankruptcy court re-opened discovery to permit the Trustee to serve additional document requests and interrogatories, and take additional depositions, as to the backup tape issue. Subsequently, the Trustee deposed Vanderheyden, Scherer and Stroble—the three BMO Harris employees involved in finding the 2014 Tapes and the 2017 Tapes.  None of these witnesses could confirm that the 2014 Tapes are the same as the 2017 Tapes, identify where the 2014 Tapes had been found, or confirm whether the 2014 Tapes currently exist.  The bankruptcy court ordered BMO Harris either to verify that the 2014 Tapes are

the same as the 2017 Tapes or remove the unverified assertion from its discovery responses.  BMO Harris did not verify this assertion thereafter.

The Trustee subsequently filed a motion for spoliation sanctions against BMO Harris in the bankruptcy court on February 19, 2019.  The Trustee alleged that BMO Harris spoliated evidence by destroying "at least 66 Minnesota backup tapes that were the only source of its pre-March 2005 emails."  BMO Harris destroyed this evidence, the Trustee argued, years after BMO Harris had been enjoined from destroying records that pertain to Petters, PCI and other affiliated entities.  The Trustee also accused BMO Harris of repeatedly lying to cover up the fact that it had destroyed this evidence.  The Trustee requested, among other remedies, an adverse-inference jury instruction reflecting that BMO Harris had destroyed evidence that was harmful to BMO Harris.

In a July 1, 2019 Order, the bankruptcy court found that, at least as early as January 2010, BMO Harris had a duty to preserve email backup tapes as evidence.  The bankruptcy court also found that BMO Harris did not take reasonable steps to preserve the email backup tapes and, to the contrary, BMO Harris intentionally destroyed email backup tapes that contained electronically stored information from before March 2005 that cannot be restored or replaced.  And BMO Harris did so without assessing the contents of the backup tapes or receiving input from counsel, despite multiple litigation holds and a court-ordered injunction prohibiting such destruction.  As a result, the bankruptcy court found, the Trustee has been prejudiced because the destroyed evidence likely contained relevant information that cannot be obtained from an alternative source.

In addition, the bankruptcy court found that BMO Harris acted in bad faith with the intent to deprive the Trustee of the use of this evidence. In reaching this finding, the bankruptcy court acknowledged that the record contains no *direct* evidence of a bad-faith intent to deprive the Trustee of evidence but nonetheless determined than the circumstantial evidence supported a finding of such bad-faith intent. Among other things, the bankruptcy court observed that BMO Harris (1) destroyed dozens of backup tapes as part of a planned project rather than merely routine maintenance; (2) destroyed evidence despite its knowledge of an injunction order and litigation holds prohibiting such destruction; (3) made no effort to assess the contents of the backup tapes or seek input from counsel; (4) and demonstrated both a lack of credibility and a willful intent to deceive by obfuscating facts, presenting inconsistent representations and testimony about facts relevant to this issue, failing to be candid with the bankruptcy court and the Trustee, and actively misleading the bankruptcy court and the Trustee.

Based on the foregoing findings, the bankruptcy court concluded that sanctions against BMO Harris are warranted under Rules 37(e)(1) and 37(e)(2) of the Federal Rules of Civil Procedure. Specifically, the bankruptcy court granted the Trustee's request for three remedial sanctions: (1) requiring an adverse inference instruction at trial advising the jury that BMO Harris intentionally destroyed evidence that it knew was harmful, (2) permitting the Trustee to present evidence to the jury about BMO Harris's destruction of evidence, and (3) prohibiting BMO Harris from objecting to the introduction of any

pre-March 2005 emails or documents produced from third parties.  BMO Harris now appeals and objects to the bankruptcy court's Spoliation Order.

## ANALYSIS

In bankruptcy proceedings, a district court typically sits as an appellate court and reviews the bankruptcy court's conclusions of law *de novo* and its findings of fact for clear error.  *First State Bank of Roscoe v. Stabler*, 914 F.3d 1129, 1136 (8th Cir. 2019); *In re Reynolds*, 425 F.3d 526, 531 (8th Cir. 2005).  A bankruptcy court's discovery orders and imposition of sanctions for discovery violations typically are reviewed for an abuse of discretion.[2]  *Ritchie Special Credit Invs., Ltd. v. U.S. Tr.*, 620 F.3d 847, 853 (8th Cir. 2010); *In re O'Brien*, 351 F.3d 832, 839 (8th Cir. 2003); *In re Spears*, 265 B.R. 219, 222 (W.D. Mo. 2001).  A "bankruptcy court abuses its discretion when its decision relies upon a clearly erroneous finding of fact or fails to apply the proper legal standard." *Ritchie*, 620 F.3d at 853.

Under Rule 37, Fed. R. Civ. P., federal courts have the authority to impose sanctions, including an adverse inference instruction, if a party fails to take reasonable steps to preserve electronically stored information that should have been preserved during or in anticipation of litigation and the information cannot be replaced through additional discovery.  Fed. R. Civ. P. 37(e).  This authority extends to bankruptcy court adversary proceedings.  Fed. R. Bankr. P. 7037 (providing that Rule 37, Fed. R. Civ. P., "applies in

---

[2]  This Court previously rejected BMO Harris's contention that the bankruptcy court's July 1, 2019 Order imposing spoliation sanctions is subject to *de novo* review, for the reasons addressed in this Court's June 1, 2022 Order.

adversary proceedings" in bankruptcy court).  Federal courts also have inherent authority to impose sanctions against a party when that party destroys evidence that it knew or should have known is relevant to potential litigation and, in doing so, prejudices the opposing party.  *See Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993).  On appeal, such decisions are reviewed for an abuse of discretion both as to the sanction imposed *and* as to the factual basis for the sanction.  *Id.*

Bankruptcy judges typically are afforded substantial deference as to discovery-related decisions—including the imposition of discovery sanctions—because the judge who imposed the sanction is most familiar with the pretrial proceedings and the pretrial conduct of counsel.  *See, e.g.*, *In re Young*, 789 F.3d 872, 882 (8th Cir. 2015) (observing that, when reviewing a bankruptcy court's imposition of sanctions, "deference should be accorded to the determinations and findings of courts on the front lines of litigation" (internal quotation marks omitted)).  A bankruptcy court's imposition of sanctions ordinarily is reviewed for an abuse of discretion so as to give deference to the determination of the judge who is "best acquainted" with counsel's litigation practices and "best situated to determine when a sanction is warranted."  *In re Yehud-Monosson USA, Inc.*, 472 B.R. 795, 807 (D. Minn. 2012) (internal quotation marks omitted); *accord ADS Holdings, Inc. v. Fed. Ins. Co.*, No. 06-3715 ADM/AJB, 2008 WL 2042624, at *3 (D. Minn. May 13, 2008) (reviewing magistrate judge's decision to impose discovery sanctions, including adverse inference instruction, for clear error).

BMO Harris contends that the bankruptcy court erred in two ways—first, by imposing an adverse-inference instruction without any evidence that BMO Harris intended to deprive the Trustee of the evidence it destroyed, and second, by erroneously finding that the destruction of email backup tapes prejudiced the Trustee.  The Court addresses BMO Harris's arguments in turn.

## I.      BMO Harris's Intent

BMO Harris first argues that the record lacks evidence that it acted with the intent to deprive the Trustee of evidence.

"If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," a court may impose sanctions.  Fed. R. Civ. P. 37(e); *accord E*Trade Secs. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005) ("The obligation to preserve evidence begins when a party knows or should have known that the evidence is relevant to future or current litigation.").  If a court finds that the loss of the information caused prejudice to another party, the court "may order measures no greater than necessary to cure the prejudice."  Fed. R. Civ. P. 37(e)(1); *accord Dillon*, 986 F.2d at 267 (observing that courts have inherent authority to impose sanctions against a party when that party destroys evidence that it knew or should have known is relevant to potential litigation and, in doing so, prejudices the opposing party).

Before imposing certain types of severe sanctions, such as an adverse-inference instruction or a presumption that the lost information was unfavorable to the sanctioned party, a court must find that the sanctioned party "acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); *accord Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 746–47 (8th Cir. 2004). Negligent conduct is insufficient to support such severe sanctions. *Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018); *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). However, because intent "rarely is proved by direct evidence," a court imposing spoliation sanctions "has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witness in a particular case, and other factors." *Morris*, 373 F.3d at 901 (reviewing for clear error a district court's intent determination with respect to spoliation of evidence).

Here, when finding that BMO Harris intended to deprive the Trustee of information, the bankruptcy court relied on circumstantial evidence pertaining to (1) the 2010 server decommissioning project that resulted in the destruction of dozens of Minnesota email backup tapes, (2) the August 2014 discovery of six Minnesota email backup tapes that had not been destroyed, and (3) the December 2017 discovery of five Minnesota email backup tapes that had not been destroyed. BMO Harris disputes the bankruptcy court's characterization of and reliance on this evidence. The Court addresses, in turn, each category of circumstantial evidence on which the bankruptcy court relied.

###### A.     2010 Server Decommissioning Project

BMO Harris first contends that the bankruptcy court erred by finding that the 2010 server decommissioning project, which resulted in the destruction of dozens of Minnesota email backup tapes, is circumstantial evidence of BMO Harris's intent to deprive the Trustee of the use of this information in this case.  According to BMO Harris, the fact that its destruction of email backup tapes was "part of a long-planned enterprise-wide project undertaken for business purposes" contradicts the bankruptcy court's finding that BMO Harris acted with the intent to deprive the Trustee of evidence.

Although the record reflects that a business purpose precipitated the destruction of the email backup tapes, the bankruptcy court did not view this fact in a vacuum.  Rather, the bankruptcy court observed—and the record reflects—that BMO Harris destroyed dozens of Minnesota email backup tapes (1) several years *after* a district court had enjoined the destruction of such information; (2) shortly after the issuance of at least two litigation hold notices that were received by, among other people, the senior employee responsible for supervising the server decommissioning project; (3) without making any effort to review the contents of the email backup tapes or prevent their destruction; and (4) without obtaining input from counsel.  In addition, the bankruptcy court observed that these "backup tapes were destroyed well after [BMO Harris] anticipated litigation, as evidenced by its own privilege log entries and formal litigation holds."  Moreover, the relevant employees involved in the server decommissioning project knew that the email

backup tapes could contain pre-March 2005 emails and likely were the only source of such emails.   BMO Harris does not meaningfully dispute any of these facts.

The bankruptcy court relied on the foregoing context when finding that the circumstances of the 2010 server decommissioning project support an inference that BMO Harris destroyed information with the intent to deprive the Trustee of the information.   BMO Harris counters that these facts demonstrate mere negligence rather than bad-faith intent and that its employees reasonably believed that the destroyed backup tapes did not contain any unique and relevant information.   But willful ignorance despite a duty to preserve evidence can be indicative of a party's bad-faith intent.   *See, e.g.*, *Stedeford v. Wal-Mart Stores, Inc.*, No. 2:14-cv-01429-JAD-PAL, 2016 WL 3462132, at *11 (D. Nev. June 24, 2016) (imposing adverse-inference sanction for spoliation of evidence and observing that defendant's "willful ignorance" was "indicative of its conscious disregard of its duty to preserve potentially relevant evidence"); *Top Tobacco, L.P. v. Midwestern Cash & Carry, LLC*, No. 11 C 4460, 2012 WL 4490473, at *2 (N.D. Ill. Aug. 3, 2012) (recommending adverse-inference sanction after finding that defendants' spoliation of evidence "was done in bad faith" because ignorance of legal requirement to preserve evidence does not excuse willful destruction of evidence), *report and recommendation adopted by* 2012 WL 4490412 (N.D. Ill. Sep. 27, 2012); *AtPac, Inc. v. Aptitude Sols., Inc.*, No. 2:10-294 WBS JFM, 2011 WL 13242817, at *9 (E.D. Cal. Apr. 13, 2011) (imposing adverse-inference sanction against defendant for spoliation and observing that "[s]crubbing [a] server despite its potential relevance demonstrates willful

ignorance or worse, not an innocent misunderstanding").   As the bankruptcy court correctly observed, when litigation is imminent or has commenced, a party cannot "blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy."  *E*Trade Secs. LLC*, 230 F.R.D. at 589 (quoting *Stevenson*, 354 F.3d at 750); *accord In re Interstate Bakeries Corp.*, 460 B.R. 222, 233 (B.A.P. 8th Cir. 2011).  As such, the 2010 server decommissioning project and destruction of email backup tapes must be evaluated in context.

It is undisputed that BMO Harris did not review the backup tapes or consult with counsel before destroying them in 2010 despite having both actual and constructive notice of its duty to preserve evidence, including a court-ordered injunction *and* multiple litigation hold notices.  And the record reflects that BMO Harris knew that the backup tapes likely contained unique and relevant information that was not preserved elsewhere. Because these circumstances demonstrate willful ignorance rather than an innocent mistake, the bankruptcy court did not err by inferring from these circumstances that BMO Harris intended to deprive the Trustee of evidence.

### B.    August 2014 Discovery of Six Minnesota Email Backup Tapes

BMO Harris next argues that the bankruptcy court erred by finding that the circumstances pertaining to BMO Harris's August 2014 discovery of six Minnesota email backup tapes is circumstantial evidence of BMO Harris's intent to deprive the Trustee of the use of information in this case.

The bankruptcy court did not rely solely on the circumstances of the 2010 server decommissioning project when inferring that BMO Harris intended to deprive the Trustee of evidence.  The bankruptcy court also considered BMO Harris's credibility and motives based on its subsequent conduct.  *See Morris*, 373 F.3d at 901 (observing that credibility and motive are relevant considerations when evaluating intent in the spoliation context).  In particular, the bankruptcy court considered the fact that BMO Harris found six Minnesota email backup tapes in 2014 but failed to review their contents, preserve them, or make a timely disclosure of their existence.  Indeed, for nearly four years BMO Harris misled its own counsel, the Trustee and the bankruptcy court—either by omission or by false implication—about BMO Harris's discovery of the six 2014 Tapes.  BMO Harris repeatedly made vague or inconsistent representations about the 2014 Tapes, including representations in this and other litigation about whether the 2014 Tapes existed, how many backup tapes were discovered in 2014, and whether those tapes were subsequently lost or destroyed.[3]  The bankruptcy court reasonably inferred from this conduct that BMO Harris obfuscated facts and lacked candor and credibility.

---

[3]     According to BMO Harris, the bankruptcy court mischaracterized this evidence.  BMO Harris contends that it interpreted requests for information pre-dating 2005 to exclude backup tapes that were created or labeled with dates after 2005.  As such, BMO Harris "did not consider the possibility that tapes dated August 2007 and later might contain" relevant pre-2005 emails.  But the bankruptcy court considered and rejected this argument.  In its spoliation order, the bankruptcy court found that this argument is "contradicted by [BMO Harris's] own witnesses who testified that they knew in 2014 that the backup tapes could have pre-March 2005 emails" and that "the only reason [BMO Harris] was looking for Minnesota backup tapes in 2014 was to locate pre-March 2005 emails in response to the spoliation claims" in another case.  The record supports these findings.  Moreover, at the hearings pertaining to BMO Harris's spoliation of evidence,

### C.     December 2017 Discovery of Five Minnesota Email Backup Tapes

BMO Harris also challenges the bankruptcy court's consideration of BMO Harris's conduct during discovery in this case in 2017 and 2018.

BMO Harris discovered five Minnesota email backup tapes on December 14, 2017. But BMO Harris failed to disclose this information during a deposition that occurred the next day, failed to disclose this information to its own counsel until more than a month later, and failed to disclose this information to the Trustee until the last day of fact discovery and more than six weeks after the tapes had been found. The bankruptcy court found that these untimely disclosures demonstrate "bad faith and the intent to hide evidence." BMO Harris argues that "[t]his delay does not provide evidence of an intent to deprive the Trustee of relevant information, especially since the tapes were restored and produced." But BMO Harris does not dispute the facts underlying the bankruptcy court's findings and instead merely disagrees with the inferences drawn by the bankruptcy court. It was not unreasonable for the bankruptcy court to infer that BMO Harris's repeated delays in disclosing important information to its own counsel and to the Trustee, together with all of the other circumstantial evidence addressed herein, reflect bad faith and an intent to hide information.

---

the bankruptcy court correctly observed that it "defies logic to assume that a tape dated 2007 or later could not, under any circumstances, contain information from dates prior to that period." The bankruptcy court later observed that it would be "preposterous" for a party to assume that a box labeled with the year "2010" would not contain documents or information relevant to an earlier timeframe and, based on that assumption, fail to search the box for responsive information. Indeed, BMO Harris's conduct suggests willful ignorance rather than an innocent mistake.

As the bankruptcy court also observed, BMO Harris engaged in an aggressive discovery strategy as demonstrated by its numerous discovery motions, its production of redacted and incomplete records, and the fact that the bankruptcy court had sanctioned BMO Harris multiple times for willful discovery violations.  Moreover, BMO Harris presented vague, incomplete, misleading and inconsistent testimony and arguments at the April 5, 2018 evidentiary hearing pertaining to both the 2014 Tapes and the 2017 Tapes.  For example, BMO Harris repeatedly represented, either expressly or by vague implication, that the six backup tapes discovered in 2014 were the same as the five backup tapes discovered in 2017 and that BMO Harris did not lose or destroy the 2014 Tapes, yet BMO Harris has provided no direct evidence to support this speculative theory.  To the contrary, in subsequent depositions, none of BMO Harris's witnesses could confirm that the 2014 Tapes are the same as the 2017 Tapes, identify where the 2014 Tapes had been found, or confirm whether the 2014 Tapes currently exist.

In addition, Ingrisano, one of the witnesses who testified at the April 5, 2018 hearing, asserted that "four or five" backup tapes were found in 2014 and that he did not know who found them, despite also testifying that he had received the email reflecting that Scherer found six backup tapes in 2014.  And Scherer, the BMO Harris employee who undisputedly found the 2014 Tapes, testified to the bankruptcy court that "a different team" handled the backup tapes and that he "didn't deal with the tapes" and "didn't touch them," but did not disclose that he had found the 2014 Tapes.  BMO Harris now contends that Scherer's testimony referred to the 2017 Tapes, not the 2014 Tapes.  But this

argument contradicts BMO Harris's simultaneous and unsubstantiated argument that the 2017 Tapes and the 2014 Tapes are one and the same.  And the context of the April 5, 2018 hearing clearly reflects that the bankruptcy court was seeking information about both the 2014 Tapes and the 2017 Tapes.

BMO Harris repeatedly asserts that the bankruptcy court mischaracterized the foregoing evidence, arguing that its counsel and witnesses provided technically accurate statements.   But technically accurate statements can be misleading by omitting information or creating a false impression by implication.  *Cf. United States v. Freeman*, 650 F.3d 673, 680 (7th Cir. 2011) (observing that false testimony may include "half-truths and vague statements that could be true in a limited, literal sense but give a false impression").  And although it is plausible that these errors and omissions were the result of good-faith lapses in memory by witnesses, BMO Harris's counsel made little or no effort to correct the errors and omissions.[4]  At best, the record reflects that BMO Harris, through its counsel and witnesses, misled the bankruptcy court and the Trustee by repeatedly presenting vague and inconsistent half-truths about the 2014 Tapes and the 2017 Tapes.  This record supports the bankruptcy court's finding that BMO Harris's "actions, obfuscation, consistent failures to be forthright, ever changing testimony, and frequent misrepresentations allow the Court to reasonably infer that [BMO Harris's]

---

[4]     Notably, BMO Harris did not call any of the witnesses who testified at the April 5, 2018, and those witnesses testified only because the Trustee called them.   Nonetheless, these witnesses worked for BMO Harris, were known to BMO Harris's counsel, and provided written declarations on BMO Harris's behalf.   The record suggests that BMO Harris made little effort to prepare these witnesses to testify and instead intended to rely solely on carefully and vaguely written declarations.

actions are a continuation of bad faith behavior and of an intent to keep the information on the Minnesota backup tapes away from [the Trustee] and others."

The bankruptcy court also observed that the Trustee "is seeking billions of dollars in damages," and that "the $2 billion dollar value of the case" provides a "motive for [BMO Harris] to destroy information." BMO Harris argues that the bankruptcy court cited "no authority for considering the amount of damages sought as evidence of intent." To the contrary, the bankruptcy court correctly recognized that the motives of the party accused of spoliating evidence are relevant considerations. *See Morris*, 373 F.3d at 901. The significant financial stakes in this case suggest that BMO Harris had a motive to hide or destroy unfavorable evidence. In addition, it is reasonable to infer that these significant financial stakes provide BMO Harris's witnesses and attorneys good reason to approach this case with careful attention, precision and accuracy, which is contrary to BMO Harris's suggestion that its repeated misrepresentations, errors, and omissions in this case are the result of negligent carelessness and mistakes. The record reflects that BMO Harris acted methodically and that its conduct was carefully calculated.

BMO Harris attempts to avoid all the foregoing inferences by relying on *Auer*, in which the United States Court of Appeals for the Eighth Circuit affirmed the district court's denial of an adverse-inference spoliation sanction. *See* 896 F.3d at 858. But *Auer* is inapposite for several reasons. First, in *Auer* the record did not clearly establish that any potentially relevant information had been lost or destroyed, let alone that the defendant's employees knew about the loss or destruction of any such information. *Id.*

In contrast, here it is undisputed that BMO Harris, through its employees, actively and intentionally destroyed dozens of email backup tapes, and the record reflects that these backup tapes likely contained unique information relevant to this case. Second, there is no indication that the defendant in *Auer* was subject to either a court-ordered injunction or multiple litigation holds, as was undisputedly the case in this matter. *See id.* Third, nothing in *Auer* suggests that the defendant's litigation conduct reflected bad-faith motives or a lack of credibility. *See id.* By contrast, as addressed above, the bankruptcy court in this case reasonably inferred the existence of bad-faith motives and found that BMO Harris—including its counsel and witnesses—lacked credibility based on BMO Harris's pattern of discovery violations, dishonesty, and inconsistent representations to the Trustee and the bankruptcy court. As such, BMO Harris's reliance on *Auer* is misplaced.

For these reasons, the bankruptcy court did not err by inferring from the circumstantial evidence that BMO Harris acted with the bad-faith intent to deprive the Trustee of relevant evidence.

## II. Prejudice

BMO Harris also argues that the bankruptcy court erred by finding that the Trustee suffered prejudice as a result of BMO Harris's spoliation of evidence.

If a court finds that the loss or destruction of information caused prejudice to another party, the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1); *accord Dillon*, 986 F.2d at 267 (observing that

courts have inherent authority to impose sanctions against a party when that party destroys evidence that it knew or should have known is relevant to potential litigation and, in doing so, prejudices the opposing party).  "Prejudice exists when spoliation prohibits a party from presenting evidence that is relevant to its underlying case."  *Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019).  Even if there is no indication that the lost or destroyed evidence "could be classified as a smoking-gun," prejudice may be established if the only source of a particular category of relevant information has been lost or destroyed.  *See Stevenson*, 354 F.3d at 748.  A finding of prejudice may be based on "a reasonable probability" that the lost or destroyed information could have materially benefited the party that has been deprived of the information.  *E\*Trade Sec. LLC*, 230 F.R.D. at 592; *accord Dillon*, 986 F.2d at 268 (affirming district court's finding that defendants were prejudiced by destruction of evidence that "may have [proved] helpful to the defense").

Here, the bankruptcy court began by acknowledging that "it is impossible to determine what information has been destroyed" because BMO Harris's "actions have made it impossible to determine the content of the backup tapes."  The Federal Rules of Civil Procedure do "not place a burden of proving or disproving prejudice on one party or the other" because ascertaining the content of lost information may be difficult in some circumstances and "placing the burden of proving prejudice on the party that did not lose the information may be unfair."  Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment; *accord Paisley Park Enters.*, 330 F.R.D. at 236 (finding prejudice when

defendants' spoliation rendered it "impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced" plaintiffs).  It is undisputed that BMO Harris made no effort to review or index the contents of the backup tapes before destroying them.  As such, the bankruptcy court did not err to the extent that she placed the burden on BMO Harris to demonstrate that its spoliation of evidence did *not* prejudice the Trustee.

The bankruptcy court next found that the destroyed backup tapes likely contained unique and relevant evidence.  "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation."  Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.  According to BMO Harris, the bankruptcy court's relevance findings are based on impermissible speculation.  To the contrary, because BMO Harris failed to review or index the backup tapes before destroying them, the bankruptcy court reasonably relied on circumstantial evidence in the record to infer that the destroyed information likely contained unique and relevant evidence.  The claims in this case pertain to a Ponzi scheme perpetrated from 1994 until 2008, and BMO Harris's backup tapes are the primary—if not the only—source of BMO Harris's emails predating March 2005.  The record reflects that BMO Harris's personnel knew that the backup tapes likely contained unique and relevant information from pre-March 2005 that was not preserved elsewhere.  And a BMO Harris witness testified that the emails from that time period likely were the best source of evidence due to fading memories.

The quantity of the spoliated evidence also is significant. BMO Harris undisputedly destroyed *dozens* of email backup tapes containing multiple years' worth of unique digital information. BMO Harris conceded to the bankruptcy court that the five Minnesota backup tapes that survived destruction and were found in December 2017 contained nearly *7 million* documents. BMO Harris attempted to minimize this fact by representing to the bankruptcy court that "[o]nly 3% or about 9,182 emails in the relevant custodians' mailboxes on the backup tapes . . . have any potential to be both non-duplicative and responsive."[5] Contrary to BMO Harris's arguments, the existence of nearly 10,000 unique and potentially relevant emails is not insignificant. And if the five surviving Minnesota backup tapes contained nearly 10,000 unique and potentially relevant documents by BMO Harris's own admission, it is reasonable to infer that the approximately *five dozen* Minnesota backup tapes that are irretrievably lost contained tens of thousands of unique and potentially relevant documents. All of the foregoing circumstantial evidence overwhelmingly supports the bankruptcy court's finding that the destroyed backup tapes likely contained unique and relevant evidence.

---

[5]     BMO Harris downplays the number relevant documents on the backup tapes when attempting to minimize the possible prejudice to the Trustee, but BMO Harris simultaneously embellishes these same facts when attempting to suggest that it has satisfied its discovery obligations and the Trustee is merely seeking cumulative evidence. For example, BMO Harris describes the Trustee's prejudice arguments as "hollow" because BMO Harris "produced millions of emails from the backup tapes that were restored in 2018," thereby providing the Trustee with a "wealth of documents" that may serve as "alternative sources" of relevant evidence. The Court is not persuaded by BMO Harris's blatantly inconsistent attempts to claim credit for producing a "wealth" of "millions" of documents while simultaneously suggesting that 97 percent of those documents, as well as the *billions* of other documents that BMO Harris irretrievably destroyed, have little or no relevance to the Trustee's case.

The bankruptcy court also rejected BMO Harris's argument that the information on the destroyed backup tapes would have been cumulative of evidence available from third parties and other sources. BMO Harris repeats these arguments to this Court. But "it will never be known whether such information would or would not have been cumulative because it is impossible to know what it was or to whom it may have been communicated." *Paisley Park Enters.*, 330 F.R.D. at 235. Moreover, as addressed above, BMO Harris knew that the backup tapes likely contained unique and relevant information from pre-March 2005 that was not preserved elsewhere and conceded to the bankruptcy court that the five Minnesota backup tapes that were *not* destroyed contained nearly 10,000 non-duplicative relevant documents. For these reasons, the record supports the bankruptcy court's finding that the spoliated evidence is not cumulative or reasonably available from alternative sources.

Even if the spoliated evidence is cumulative to some extent, the availability of the same or similar evidence from third parties or other sources does not necessarily demonstrate a lack of prejudice. *See, e.g.*, *Dillon*, 986 F.2d at 267–68 (affirming finding of prejudice when alternative sources of spoliated evidence were not of sufficiently similar quality); *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 462 (8th Cir. 2013) (observing that plaintiff "would undoubtedly have benefited from producing actual documents and examining their contents at a trial . . . rather than providing third-party testimony as to their once-existence"); *Paisley Park Enters.*, 330 F.R.D. at 235 (observing that "even when the information lost is cumulative to some extent, the loss of

the information still has an impact" (internal quotation marks omitted)).  And one party to a lawsuit does not "possess the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case."  *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014).

BMO Harris's unilateral speculation that the spoliated evidence is either duplicative or of "marginal relevance" is contrary to the record and unpersuasive.  The record reflects that, when deposed, numerous BMO Harris employees could not recall numerous important details from the time period relevant to the Trustee's claims.  One BMO Harris employee, who was a business banker during the relevant time period, could not remember all of the details from that time period and testified that the best source of information from that time period would have been her emails.  In addition, the bankruptcy court found that BMO Harris's email archive system after March 2005 did not preserve the same information that the backup tapes preserved, "including calendar events, attachments, and all other files contained in a given mailbox."  For all these reasons, even if some of the spoliated evidence overlaps with evidence available from alternative sources, it is unlikely that those alternative sources are of the same quality or scope as the spoliated evidence.

In summary, although it is impossible to determine the precise quantity or quality of relevant evidence that BMO Harris destroyed, the record supports the bankruptcy court's reasonable inference that BMO Harris's spoliation of evidence has prevented the Trustee from presenting evidence that is relevant to this case.  Accordingly, the

bankruptcy court did not err by finding that the Trustee was prejudiced by BMO Harris's spoliation of evidence, nor did the bankruptcy court abuse its discretion by imposing spoliation sanctions against BMO Harris.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein,

**IT IS HEREBY ORDERED** that the bankruptcy court's July 1, 2019 Order is **AFFIRMED**.

Dated:  July 18, 2022                                   s/Wilhelmina M. Wright
                                                        Wilhelmina M. Wright
                                                        United States District Judge